# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

AMELIA QUELAS,

        Plaintiff-Appellant,

v

DAIMLER TRUCKS NORTH AMERICA, LLC,
DETROIT DIESEL CORPORATION, and
FREIGHTLINER, LLC,

        Defendants-Appellees.

UNPUBLISHED
March 21, 2017

No.   326290
Wayne Circuit Court
LC No.   12-104629-CZ

AMELIA QUELAS,

        Plaintiff-Appellee,

v

DAIMLER TRUCKS NORTH AMERICA, LLC,
DETROIT DIESEL CORPORATION, and
FREIGHTLINER, LLC,

        Defendants-Appellants.

No.   326345
Wayne Circuit Court
LC No.   12-104629-CZ

AMELIA QUELAS,

        Plaintiff-Appellee,

v

DAIMLER TRUCKS NORTH AMERICA, LLC,
DETROIT DIESEL CORPORATION, and
FREIGHTLINER, LLC,

        Defendants-Appellants.

No.   328766
Wayne Circuit Court
LC No.   12-104629-CZ

-1-

AMELIA QUELAS,

        Plaintiff-Appellant,

v

DAIMLER TRUCKS NORTH AMERICA, LLC,
DETROIT DIESEL CORPORATION, and
FREIGHTLINER, LLC,

        Defendants-Appellees.

No. 330363
Wayne Circuit Court
LC No. 12-104629-CZ

Before: TALBOT, C.J., and MURRAY and BOONSTRA, JJ.

PER CURIAM.

These consolidated appeals arise out of the employment of plaintiff, Amelia Quelas, in Mexico. In Docket No. 326290, Quelas challenges the trial court's order granting summary disposition in favor of defendants, Daimler Trucks North America, LLC (Daimler) and Detroit Diesel Corporation (DDC), formerly known as Freightliner, LLC (Freightliner). In Docket No. 326345, Daimler and DDC appeal from the trial court's order denying their motion for attorney fees pursuant to MCL 600.2591. We affirm both orders.

In Docket No. 328766, Daimler and DDC challenge the trial court's decision to deny their request for sanctions pursuant to MCR 2.114 with regard to a motion filed by Quelas. We vacate the trial court's decision in this regard and remand for further proceedings. Finally, in Docket No. 330363, Quelas challenges the trial court's award of over $300,000 in expert witness fees as taxable costs pursuant to MCR 2.625. We affirm the award of costs, but remand for correction of the amount of costs due to a computational error.

## I. FACTS

Before beginning her employment in Mexico, Quelas lived in California, where she worked for Penske Corporation (Penske). In 1997, Quelas began a position leading Diesel Allison de México (DDAM) in Mexico City. At the time, DDAM was a subsidiary of Freightliner (now DDC), and Freightliner was a subsidiary of Penske. While there is no signed employment contract, the parties agree that to effectuate this appointment, Quelas became an employee of DDC, which then assigned her to work for DDAM. Quelas's salary and employment benefits were paid and coordinated by DDC. Quelas relocated her family from California to Mexico. Quelas lived and worked there for 10 years. During these years, Penske sold DDC (along with DDAM) to Daimler. Over time, Quelas was given additional duties, and eventually was in charge of Daimler's Latin American subsidiaries.

However, in 2007, Daimler's business practices office investigated Quelas after allegations of improper business dealings surfaced. Daimler suspended Quelas with pay on

February 20, 2007. The investigation was completed on April 5, 2007. Daimler substantiated eight of nine allegations. Daimler offered Quelas three options: termination, relocation to a different position in the United States or Canada, or a negotiated separation. After Quelas failed to select any option, Daimler stopped her pay and other benefits.

Soon thereafter, Quelas interviewed for and was offered a position with a company located in Troy, Michigan. After obtaining this offer, on June 4, 2007, Quelas appeared at DDAM's headquarters in Mexico, accompanied by a public notary. Quelas claimed to be appearing to work in her former position. She was rejected entry. On June 17, 2007, Quelas formally accepted the position in Troy. Then, on June 25, 2007, Quelas filed a complaint with the Mexican Labor Board (the Board). She named DDAM and eleven other Mexican companies as defendants, but omitted Daimler or DDC. Generally speaking, she claimed that she was unjustly terminated on June 4, 2007, and sought reinstatement to her former position and back wages, or in the alternative, severance pay as is available by statute in Mexico.

Quelas's employment in Troy was short-lived, and in 2008, she moved to Dubai with her family. Before the Board, the parties disputed whether the suit should be litigated in Mexico, as Quelas argued, or before a California court, as DDAM contended. In 2010, the Board agreed that DDAM was Quelas's employer and that the suit was properly brought before the Board. At this point, DDAM offered to reinstate Quelas. Left unresolved was Quelas's entitlement to back wages for the period from her purported termination in June 2007 through her August 2010 reinstatement.

Quelas left Dubai and returned to Mexico on August 30, 2010, in order to restart her position with DDAM. However, the reinstatement lasted only eight days before she was asked to leave. Quelas then filed a second suit before the Board, naming the same defendants as before. Rather than litigate the case, DDAM elected to treat Quelas as a "trusted employee" under Mexican law and terminate her employment. A final order terminating her employment was entered by the Board on November 3, 2011. As part of the order, Quelas was awarded back wages for the period from her September 8, 2010 termination through the date of the Board's award, plus statutory severance based on her salary and years of service. The award totaled approximately $1.7 million, and was a final resolution of this second complaint.

In November, 2012, Quelas filed the present suit in Michigan, naming Daimler and DDC as defendants. She claimed that Daimler and DDC breached a contract by failing to pay her full wages from the date of her suspension through November 3, 2011; that she was wrongfully terminated on November 3, 2011; a violation of the Elliott-Larsen Civil Rights Act (ELCRA),[1] a claim of intentional infliction of emotional distress (IIED); and a count entitled "Aiding and

---

[1] MCL 37.2101 *et seq*.

Abetting," in which she alleged that Daimler and DDC acted in concert and thus were jointly liable for any and all damages.[2]

In June, 2014, Daimler and DDC moved for summary disposition in Michigan. Before Quelas filed her response, the Board issued an opinion in which it awarded Quelas $2.2 million in back wages for the period between June 4, 2007, and her August 30, 2010 reinstatement. Both sides appealed; DDAM challenged the award, while Quelas sought approximately $250,000 in vacation pay that accrued prior to June 4, 2007, in addition to the $2.2 million judgment.

Back in Michigan, the trial court granted the motion for summary disposition and denied Quelas's motion for reconsideration, resulting in the first appeal filed in this matter. After this decision, Daimler and DDC sought approximately $1.85 million in attorney fees pursuant to MCL 600.2591, arguing that the complaint was frivolous.[3] Daimler also sought nearly $400,000 in taxable costs. On February 19, 2015, the trial court denied the motion for attorney fees, finding that the complaint was not frivolous. Daimler and DDC appealed this decision, the second appeal arising in this case.

On June 5, 2015, while the question of taxable costs was still unresolved, the Mexican appellate court issued two "Amparo" decisions. The court agreed that Quelas was entitled to vacation pay. However, it also concluded Quelas failed to prove an unjust termination on June 4, 2007, and thus, was not entitled to an award of damages after that date. The matter was remanded to the Board for entry of a decision conforming with the appellate court's ruling. The Board entered its ruling on July 2, 2015. After a lengthy recitation of the history of the case, the Board explained the Amparo decisions and ruled accordingly.[4] The Board awarded Quelas her vacation pay, but vacated the $2.2 million judgment.

Soon after, Quelas filed a motion seeking to stay the pending proceedings regarding taxable costs. The trial court struck the motion. It also rejected a cross-motion for sanctions filed by Daimler and DDC. Daimler and DDC appealed this denial of sanctions, the third appeal arising from this matter. The trial court held an evidentiary hearing regarding the issue of taxable costs. The primary issue was whether Daimler and DDC were entitled to recover over $300,000 in expert witness fees as taxable costs. After the hearing, the trial court agreed that the costs were taxable. Quelas appealed this decision, the fourth and final appeal filed in this matter.

## II. DOCKET NO. 326290

---

[2] Quelas also pleaded two other counts that were later voluntarily dismissed: (1) a count seeking interest on the Board's award, and (2) a count under the Whistleblower Protection Act, MCL 15.361 *et seq*.

[3] This sum represented the fees of five attorneys, who worked a total of roughly 8,325 hours on the case.

[4] Both parties have provided this Court with translations of the Board's July 2, 2015 decision. We have reviewed both. While the words used by the translators are not identical, we have found no meaningful differences between the translations.

In Docket No. 326290, Quelas challenges the trial court's summary disposition ruling. We agree with the trial court's conclusion that Mexican law governs this action in its entirety. Under Mexican law, Quelas's claims necessarily fail, and accordingly, the trial court correctly granted summary disposition in Quelas's favor.

We review a trial court's decision on a motion for summary disposition de novo on appeal.[5] This portion of the motion was brought under MCR 2.116(C)(7). As our Supreme Court has explained:

> A party may support a motion under MCR 2.116(C)(7) by affidavits, depositions, admissions, or other documentary evidence. If such material is submitted, it must be considered. MCR 2.116(G)(5). Moreover, the substance or content of the supporting proofs must be admissible in evidence. . . . Unlike a motion under subsection (C)(10), a movant under MCR 2.116(C)(7) is not required to file supportive material, and the opposing party need not reply with supportive material. The contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant.[6]

"This Court reviews questions regarding conflicts of law de novo."[7] Quelas also argues that Daimler and DDC were barred from relying on Mexican law because of their failure to strictly comply with the mandates of MCR 2.112. "Interpretation of a court rule is a question of law that this Court reviews de novo."[8]

### A. MCR 2.112(J)

MCR 2.112(J) provides that "[a] party who intends to rely on or raise an issue concerning the law of . . . a foreign nation or unit thereof . . . must give notice of that intention either in his or her pleadings or in a written notice served by the close of discovery."[9] As this Court has explained, "[o]bviously, the purpose of MCR 2.112 is to give notice; a party that already has notice should not be heard to complain of a technical violation of the rule."[10]

Quelas's argument is devoid of merit because she had such notice. Clearly, Quelas was aware that there could be a question regarding whether Mexican law would apply from the outset

---

[5] *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

[6] *Id*. at 119.

[7] *Burney v P V Holding Corp*, 218 Mich App 167, 171; 553 NW2d 657 (1996).

[8] *Wilcoxon v Wayne Co Neighborhood Legal Servs*, 252 Mich App 549, 553; 652 NW2d 851 (2002).

[9] MCR 2.112(J)(3).

[10] *Zantop Int'l Airlines, Inc v Eastern Airlines*, 200 Mich App 344, 352; 503 NW2d 915 (1993). Thus, to the extent that Quelas contends there is no "exception" to the rule in cases where the opposing party has actual notice of the choice-of-law issue, she is incorrect.

of this case. Quelas's Michigan complaint discussed the Mexican proceedings, and included a count seeking interest on the Board's award. Thus, it was patently obvious that the law of a foreign jurisdiction could be at issue. Further, at a hearing held on April 3, 2013, while discovery was still open, the trial court questioned whether Mexican law would govern the dispute, at least with regard to Quelas's contract claims. Quelas's attorney stated that he "believe[d] Michigan law will govern," a statement that indicated Quelas was well aware that choice of law was an issue that could be disputed. Further, when Daimler and DDC argued that Mexican law should apply in their motion for summary disposition, Quelas never suggested that she was unfairly surprised by this position. Rather, she argued for the application of Michigan law over Mexican law. Thus, at the motion for summary disposition phase, it is apparent that Quelas did not feel unfairly surprised by the position taken by Daimler and DDC.

Quelas did not even raise this point in her motion for reconsideration of the trial court's decision. Instead, the court rule was first mentioned by Quelas in a "Notice of Supplemental Authority Supporting Rehearing" filed more than six months after Daimler and DDC argued for the application of Mexican law in their motion for summary disposition, and some 60 days after the trial court's order granting the motion. That it took over six months for Quelas to realize that she was unfairly surprised when Daimler and DDC raised the issue, an argument that she had – *twice* – briefed extensively, demonstrates the specious nature of her position on appeal. And in any event, we need not even address the notice issue because it was not properly preserved. At best, this issue could be considered raised in connection with Quelas's motion for reconsideration. "Where an issue is first presented in a motion for reconsideration, it is not properly preserved."[11] This Court need not address unpreserved issues.[12]

## B. CONTRACT CLAIMS

In contract matters, Michigan relies on the approach described in the Restatement Conflict of Laws, 2d, for resolving conflict-of-law questions.[13] In this matter, there is no express contractual provision choosing any particular law to govern contractual disputes. Thus, the Restatement Conflict of Laws, 2d, § 188 provides the relevant framework:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the

---

[11] *Vushaj v Farm Bureau Gen Ins Co*, 284 Mich App 513, 519; 773 NW2d 758 (2009).

[12] *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 387; 803 NW2d 698 (2010). See also *Northland Wheels Roller Skating Ctr, Inc v Detroit Free Press, Inc*, 213 Mich App 317, 330; 539 NW2d 774 (1995) (declining to address an issue regarding attorney fees "[b]ecause th[e] issue was not raised at the hearing of defendant's motions for summary disposition . . . .").

[13] *Chrysler Corp v Skyline Indus Servs, Inc*, 448 Mich 113, 124-125; 528 NW2d 698 (1995). We note that both parties rely on pre-*Chrysler Corp* cases when discussing choice-of-law principles that apply to contract issues. *Chrysler Corp* explicitly rejected the framework utilized in these prior cases and established the Restatement's framework as controlling in this state.

most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189 - 199 and 203.

Comment (e) to this section of the Restatement provides guidance regarding the relative importance of these factors. The place of contracting, "[s]tanding alone, . . . is a relatively insignificant contact."[14] It will have "little significance, if any, when it is purely fortuitous and bears no relation to the parties and the contract . . . ."[15] The place of negotiation is generally considered a significant factor. However, it is "of less importance where there is no single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone."[16] The place of performance "has an obvious interest in the nature of the performance and in the party who is to perform."[17] "It is clear that the local law of the place of performance will be applied to govern all questions relating to details of performance[.]"[18] With regard to the site of the subject matter of the contract, the comment explains:

---

[14] 1 Restatement Conflict of Laws, 2d, § 188, comment (e).

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

When the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment, the location of the thing or of the risk is significant . . . . The state where the thing or the risk is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the thing or of the risk as important. Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract.[19]

Finally, with regard to the location of the parties, the comment explains:

These are . . . places of enduring relationship to the parties. Their significance depends largely upon the issue involved and upon the extent to which they are grouped with other contacts. So, for example, when a person has capacity to bind himself to the particular contract under the local law of the state of his domicil, there may be little reason to strike down the contract because that person lacked capacity under the local law of the state of contracting or of performance . . . . The fact that one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts, such as that this state is the place of contracting or of performance or the place where the other party to the contract is domiciled or does business. . . . At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter state.[20]

In this matter, there are two contracts at issue. The first, which is at issue in Count I of the complaint, involves Quelas's agreement to work in Mexico. Virtually none of the Restatement factors would warrant the application of Michigan law to Quelas's claims arising from this contract. The first consideration, one that has significance, is the place of negotiation. However, it is not entirely clear when or where the agreement was negotiated. There are some indications that the contract was negotiated in California. The contract was clearly negotiated in 1996 or prior, as an announcement that Quelas would be assuming her role in Mexico was made in 1996. During this time, Quelas lived in California and worked for Penske, a California-based company. Further, at the motion hearing, Quelas's attorney represented that Quelas was in California "at the time the negotiations occurred." But given the unclear evidentiary record on this particular fact, we treat the factor as a nullity.[21]

---

[19] *Id.*

[20] *Id.*

[21] On appeal, Quelas now contends that the agreement was negotiated in Redford, Michigan, in 1996. As is discussed *infra*, the only evidence she cites is her own affidavit, which we may not

The second factor is the place of contracting, a contact with relatively little significance. Again, it is not clear where the contract was consummated. There is no written contract between the parties. That said, Quelas's attorney represented that Quelas was in California when she "got the job in Mexico." Based on this statement, it would appear that the contract was consummated in California. But again, this contact is fairly insignificant.

The third factor is the place of performance of the contract. As explained, this is a particularly important contact. Virtually all of Quelas's duties were to be performed in Mexico. As the parties contemplated, Quelas moved her family to Mexico City, where she carried out her job functions. This continued for 10 years. And as Quelas's duties evolved, her work continued to encompass the management of Daimler's Latin America businesses. In contrast, she was never in control of any U.S.-based entities. Clearly, the contract was performed in Mexico. The fourth factor, the location of the subject matter of the contract, likewise weighs in favor of applying Mexican law. The contract concerned Quelas's management of a subsidiary, DDAM, which was located in Mexico.

The final factor concerns the residence or location of the parties. When Quelas agreed to move to Mexico, she was a resident of California. Daimler's principal place of business is in Portland, Oregon, while DDC's principal place of business is in Detroit. Thus, the only true connection to Michigan is the fact that DDC had its principal place of business in Michigan. Given that this is the only connection, there is little reason to apply Michigan law. Rather, the most significant contacts are with Mexico, and accordingly, the trial court correctly concluded that Mexican law should govern Count I of the complaint.

Count II of the complaint concerns the terms of Quelas's February 20, 2007 suspension. To the extent there was any negotiation of this suspension, it was negotiated in Portland, Oregon. The agreement was similarly executed in Oregon, as that is where Quelas was informed of the suspension. The place of performance and subject matter of the agreement was Mexico, as Quelas was to remain in Mexico during her suspension, and she was to continue receiving her wages and other benefits there. Quelas was a Mexican resident at the time. Daimler, the second party to the suspension, was incorporated in Delaware, with a principal place of business in Oregon. There are no ties whatsoever to Michigan present with respect to this agreement. Accordingly, Mexican law governs Count II of the complaint as well.

_____

consider because it was not before the trial court when the motion was decided. See *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 474 n 6; 776 NW2d 398 (2009) (where affidavits were provided to the trial court for the first time on a motion for reconsideration, the trial court "properly declined to consider these affidavits," and this Court "similarly decline[d] to consider on appeal the contents of these untimely filed affidavits."). Quelas's reply brief on appeal refers this Court to a "correlation chart" in which she claims that this particular fact was supported by evidence presented to the trial court before it decided the motion. But the "evidence" she cites is not evidence at all: it is the first page of her responsive brief filed in the trial court. Further, that particular page contains no evidentiary citations, nor does it even mention this purported negotiation. There is simply no evidence properly before the trial court or this Court indicating that the contract was negotiated in Michigan.

On appeal, Quelas contends that her employment contract was negotiated and consummated in Michigan. She claims that she interacted with supervisors located in Redford, and that all direction she received came from Michigan. She further explains that her salary was paid from Michigan, and that her health and pension benefits were managed in Michigan. Quelas also explains that her tax and other legal matters related to her employment were handled by DDC's Michigan-based human resources department. However, to support these arguments, Quelas relies on an affidavit she signed on December 15, 2014, approximately a month after the trial court decided the motion for summary disposition, which was then presented to the trial court with Quelas's motion for reconsideration. Because the affidavit had not been provided to the trial court when it decided the motion, the trial court refused to consider it. The trial court properly refused to consider the affidavit, and this Court must do likewise.[22]

In her reply brief, Quelas claims that her affidavit merely restates facts already present in the record presented to the trial court when it decided the motion, and references a "correlation chart" which is attached as Exhibit 5 to her reply brief. One might question why Quelas ever authored the affidavit if it merely presented evidence that was already available to the trial court. Further, the correlation chart does not generally refer to evidence; it refers almost exclusively to various briefs filed in the trial court, including briefs filed after the summary disposition phase. This is true with regard to the most important portions of the affidavit, those indicating where the contract was negotiated and formed. Simply put, statements made in briefs are not evidence.

Quelas also cites to a letter, written on DDC letterhead and dated September 26, 2000, which explains that Quelas is "currently employed by Detroit Diesel Corporation World Headquarters which is located in Detroit, MI," and that she "is on a temporary international assignment in Mexico." This letter does little more than explain that Quelas was employed by DDC and that DDC is headquartered in Detroit, facts that are not truly contested. And in any case, the letter cannot be considered by this Court. Like Quelas's affidavit, the letter was not provided to the trial court when it decided the motion for summary disposition, but rather, only when Quelas moved for reconsideration of the trial court's decision.[23]

The only fact asserted by Quelas on appeal that is supported by evidence that is properly before us is that Quelas was paid by DDC. This is not a relevant consideration under the Restatement approach. Further, where Quelas's paychecks originated is simply a function of the location of DDC's headquarters. As explained above, although DDC is headquartered in Detroit, given that virtually no other factor weighs in favor of applying Michigan law, the trial court did not err in holding that Mexican law applied to the breach of contract counts.

B. TORT CLAIM

---

[22] See *Innovative Adult Foster Care, Inc*, 285 Mich App at 474 n 6.

[23] *Id*.

In tort matters, Michigan courts "apply Michigan law unless a 'rational reason' to do otherwise exists."[24] Determining whether there exists a rational reason to displace Michigan law is a two-step process.[25] "First, we must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome."[26] "If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests."[27]

Given that Quelas decided not to pursue her IIED claim, the only tort claim at issue is her employment discrimination claim under ELCRA. Clearly, Mexico has an interest in applying its law to claims arising out of an employment relationship where virtually the entire relationship existed within its boundaries.[28] Quelas worked in Mexico for 10 years, as the head of a Mexican company, and her tort claims arise out of that relationship. Further, the Mexican legal system has expressed an interest in the employment relationship, as it has resolved two complaints brought before its labor board related to the very same employment relationship. In the process, the Mexican Labor Board rejected DDAM's argument that Quelas's true employer was based in the United States and that a United States forum should govern. Instead, it accepted Quelas's own arguments, made in that country, that her employment relationship was with DDAM. Quelas cannot seriously dispute that Mexico has an interest in this matter.

One assertion made by Quelas on appeal must be discussed, as it is flatly untrue. In describing the recent Mexican appellate decision with respect to her first complaint, Quelas asserts that the decision was based on a conclusion that DDAM was not, in fact, her employer, and that her employer was DDC. Thus, according to Quelas, the reversal of the $2.2 million verdict was based on a finding that DDAM had no responsibility to pay Quelas's wages and benefits, and that instead, DDC was responsible. This is simply not what occurred. As the translation of the Board's opinion on remand—provided to us by Quelas—states:

> [T]he plaintiff herself acknowledged the company for whom she was working was DETROIT DIESEL ALLISON DE MÉXICO, S. DE R.L. DE C.V. (current name), company who acknowledged the labor relationship and offered the job to the plaintiff, therefore, *it is evidently clear that the employer of the plaintiff was that company* . . . [.] [C]onsequently, as analyzed previously, the job offer made by the defendant company DETROIT DIESEL ALLISON DE MÉXICO . . . was made in good faith, consequently, the exhaustive evidence to prove the unjustified dismissal asserted by the plaintiff in her claim, which she says occurred on June 4,

---

[24] *Sutherland v Kennington Truck Serv, Ltd*, 454 Mich 274, 286; 562 NW2d 466 (1997).

[25] *Id*.

[26] *Id*.

[27] *Id*.

[28] See *Burney*, 218 Mich App at 174 ("[T]he injury state always has an interest in conduct within its borders.").

2007, corresponded to herself . . . [.] [*B*]*y the fact of not proving the unjustified dismissal which she complained of, the aforementioned company* [*(DDAM)*] *is absolved from paying for such salaries*.

The Board's opinion concludes with the following:

THE FOLLOWING HAS BEEN RESOLVED

FIRST. – The plaintiff partially proved the grounds of her action and defendants DETROIT DIESEL ALLISON DE MÉXICO . . . partially justified their exemptions and defense . . . .

SECOND. – The company named DETROIT DIESEL ALLISON DE MÉXICO . . . is ordered to pay the plaintiff, Ms. AMELIA PAULINE QUELAS KURI the total sum of US $243,427.66 United States of America dollars . . . .

THIRD. – DETROIT DIESEL ALLISON DE MÉXICO . . . is absolved from the other demands brought by the plaintiff in her claim . . . .

Plaintiff's contention that DDAM was deemed not to be her employer in the above opinion is not, and cannot, be true. The Board explicitly found that DDAM was Quelas's employer. The reason for vacating the $2.2 million award was that Quelas failed to satisfy the burden of proof of proving an unjust termination, which was, in fact, properly on her. Further, while DDAM was absolved of the $2.2 million judgment, it was ordered to pay nearly a quarter of a million dollars in damages to Quelas, based on her claim for back vacation pay. Plaintiff's characterization of the Board's decision makes no sense whatsoever, as the Board could not logically order DDAM to pay back wages to Quelas if it was not her employer.[29]

_____

[29] Quelas's appellate brief cites many portions of the Board's decision in an attempt to show that the Board did, in fact, conclude that DDAM was not her true employer. After reading the translations provided by the parties, it is clear that the portions cited by Quelas actually describe the procedural history of the case, including the positions taken by the parties at all stages of the proceedings. Thus, the sentences quoted by Quelas in her appellate brief are not holdings of the Board or of the appellate court, but rather, explanations of positions taken by the parties during litigation.

Quelas also relies on the affidavit of her expert on Mexican law, Eduardo Bustamante, who claims that the appellate court reversed the Board's award of $2.2 million with regard to the first Mexican complaint "on the ground that the Mexican entities to which Quelas provided services did not and in fact could not have discharged her because Quelas'[s] employment relationship and subordination was with DDC in the United States, and that, therefore, Mexican Law did not apply to her claims against DDAM." Put simply, Bustamante's characterization of the opinion is false.

To the extent there could be any confusion, it is resolved by the fact that DDAM was ordered to pay vacation benefits arising from the employment relationship. There is simply no

-12-

Thus, the question is whether Michigan has an interest that would outweigh that of Mexico. We conclude that it does not. At the time of the conduct at issue in this case, the only connection to Michigan was the fact that DDC was headquartered in this state. Quelas resided in Mexico and, regardless of where her paychecks originated, was serving as an upper-level manager of a Mexican company. And, as Daimler and DDC note, she points to no discriminatory conduct that occurred in Michigan.

Quelas argues that Michigan's interest is substantial because she "was a United States resident throughout her entire expatriate assignment" and because she "maintained United States residence-eligibility while in Mexico . . . ." While we do not dispute the accuracy of these statements, these statements gloss over the fact that Quelas's connection to the United States during her assignment was to *California*. Before she moved to Mexico, she lived in California, and she expected to return there once her assignment in Mexico ended. Quelas's argument fails to demonstrate any interest held by Michigan.

Quelas also notes that she was a Michigan resident at the time of her "termination" in 2011. The termination she refers to is the order finally dissolving her relationship with DDAM and its parent companies that resulted from her second complaint before the Board. While this might constitute a termination of sorts, for all practical purposes, Quelas's employment ended first in 2007. She was then reinstated on August 30, 2010, before being terminated a second time within approximately one week. Quelas's second Mexican complaint alleged a wrongful termination as of August 8, 2010; thus, she clearly understood that she was actually terminated from her employment as of that date. That Quelas was a resident of Michigan when the Board finally decided her second complaint means nothing. Michigan is simply where she happened to be when the Board's decision was issued. The alleged harm that forms the basis for Quelas's tort claim occurred while she was in Mexico. Under the circumstances, Mexico's interests outweigh those of Michigan, and thus, Michigan law does not apply.

Quelas does correctly note that the trial court did not explicitly explain whether, under Mexican law, her claims would be barred. However, this omission does not justify reversal. With respect to Quelas's wrongful termination and breach of contract claims, it is undisputed that these claims would be barred by Mexico's 60-day statute of limitations for bringing employment-related claims.[30] Quelas's ELCRA claim necessarily fails because ELCRA is a Michigan statute, and does not exist under Mexican law.[31] Quelas's "aiding and abetting" count is not a separate tort, but a theory of joint and several liability. And while Quelas chastises the trial court for failing to explicitly rule that her claims would be barred under Mexican law, she

---

logical way DDAM could be ordered to pay vacation benefits, yet be deemed not to be Quelas's employer and be absolved from the prior damages award on that basis.

[30] Both Quelas's expert in Mexican law and Daimler's and DDC's expert in Mexican law agree that Mexico has a 60-day statute of limitations for employment claims, which Quelas's Michigan complaint clearly fails to satisfy.

[31] See *Severine v Ford Aerospace & Communications Corp*, 118 Mich App 769, 777; 325 NW2d 572 (1982) (where Pennsylvania law governed tort claims, a claim raised under ELCRA necessarily failed).

-13-

has never presented any argument showing how her claims could survive under Mexican law. Thus, under Mexican law, there are no cognizable claims raised in Quelas's complaint. For that reason, summary disposition was appropriate.[32]

DOCKET NO. 326345

In Docket No. 326345, Daimler and DDC challenge the trial court's decision regarding their request for attorney fees under MCL 600.2591. We find no basis to reverse this decision.

Generally, this Court reviews a trial court's award of attorney fees for an abuse of discretion.[33] "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes."[34] "This Court will not disturb a trial court's finding that a claim was frivolous unless the finding is clearly erroneous."[35] "A trial court's decision is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made."[36] "Clear error signifies a decision that strikes [the reviewing court] as more than just maybe or probably wrong."[37]

Quelas raises a procedural issue, contending that the request for sanctions was untimely because it was not filed before the summary disposition ruling. She is incorrect. Daimler and DDC sought attorney fees under MCL 600.2591. This statute provides:

(1) Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney.

(2) The amount of costs and fees awarded under this section shall include all reasonable costs actually incurred by the prevailing party and any costs allowed by law or by court rule, including court costs and reasonable attorney fees.

(3) As used in this section:

---

[32] Quelas also challenges alternative theories relied on by the trial court, the election-of-remedies doctrine, see *Barclae v Zarb*, 300 Mich App 455, 486; 834 NW2d 100 (2013), and the doctrine of res judicata, see *Garrett v Washington*, 314 Mich App 436, 441; 886 NW2d 762 (2016). Because the matter is resolved by the choice-of-law question, we decline to address these alternative theories.

[33] *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008).

[34] *Id*.

[35] *In re Attorney Fees & Costs*, 233 Mich App 694, 701; 593 NW2d 589 (1999).

[36] *Id*.

[37] *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

-14-

(a) "Frivolous" means that at least 1 of the following conditions is met:

(*i*) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

(*ii*) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

(*iii*) The party's legal position was devoid of arguable legal merit.

(b) "Prevailing party" means a party who wins on the entire record.[38]

The caselaw cited by Quelas addresses MCR 2.114, a different avenue for seeking sanctions.[39] As Daimler and DDC correctly note, only a prevailing party is entitled to seek sanctions under MCL 600.2951. Requiring the filing of a motion for sanctions prior to the summary disposition ruling is entirely illogical, as there could be no prevailing party until a decision on the motion was reached. Quelas's challenge to the timing of the request lacks merit.

This Court extensively addressed MCL 600.2951 in *Louya v William Beaumont Hosp*.[40] In *Louya*, this Court explained that to determine if a suit is frivolous under MCL 600.2951, "it is necessary to determine whether there was a reasonable basis to believe that the facts supporting the claim were true *at the time the lawsuit was filed . . . .*"[41] This Court stated, "There is a significant difference between bringing a lawsuit with no basis in law or fact at the outset and failing to present sufficient evidence to justify relief at trial."[42] This Court went on to explain:

> Furthermore, the mere fact that the attorney may doubt the possibility of success on the merits of a case, even at the outset of litigation, does not necessarily and logically lead to a conclusion that the claim is "frivolous" as defined by MCL 600.2591(3)(a)(ii); MSA 27A.2591(3)(a)(ii). Rule 3.1 of the Michigan Rules of Professional Conduct prohibits an attorney from instituting or defending a frivolous action. However, the comment to the rule also provides:
>
> > The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. *Such action is not frivolous even*

---

[38] MCL 600.2591.

[39] See *Maryland Cas Co v Allen*, 221 Mich App 26, 29-30; 561 NW2d 103 (1997); *Antonow v Marshall*, 171 Mich App 716, 719; 430 NW2d 768 (1988).

[40] *Louya v William Beaumont Hosp*, 190 Mich App 151; 475 NW2d 434 (1991).

[41] *Id*. at 162.

[42] *Id*.

*though the lawyer believes that the client's position ultimately will not prevail.* [Emphasis added.]

In our view, the statute at issue and the rules of professional conduct should be read in harmony, if possible, to avoid the anomalous result of holding a lawyer personally liable for an opponent's costs and attorney fees after ethically representing a client's interest.

\* \* \*

We will not construe MCL 600.2591; MSA 27A.2591 in a manner that has a chilling effect on advocacy or prevents the filing of all but the most clear-cut cases. Nor will we construe the statute in a manner that prevents a party from bringing a difficult case or asserting a novel defense, or penalizes a party whose claim initially appears viable but later becomes unpersuasive. Moreover, an attorney or party should not be dissuaded from disposing of an initially sound case which becomes less meritorious as it develops because they fear the penalty of attorney fees and costs under this statute.

In this case, the court's failure to focus its inquiry on what [counsel] reasonably believed at the time he commenced the case is of critical importance. The statutory scheme is designed to sanction attorneys and litigants who file lawsuits or defenses without reasonable inquiry into the factual basis of a claim or defense, not to discipline those whose cases are complex or face an "uphill fight." The ultimate outcome of the case does not necessarily determine the issue of frivolousness.[43]

Thus, and as this Court has also held, "[t]he circumstances existing at the time a case is commenced [are] of critical importance in determining if a lawsuit has a basis in fact or law."[44]

Daimler and DDC's arguments on appeal all suffer from the same flaw: the arguments almost exclusively focus on the result of the summary disposition hearing, not the circumstances when the case was filed. Daimler and DDC explain at length why Quelas's claims were governed by Mexican law. Daimler and DDC chastise Quelas's counsel for what they and the trial court found to be meritless arguments presented at the summary disposition phase.[45] While this argument might show that the claim ultimately was proven meritless, it does not show that the complaint was frivolous when filed.

---

[43] *Id.* at 162-164.

[44] *Meagher v Wayne State Univ,* 222 Mich App 700, 727; 565 NW2d 401 (1997).

[45] Daimler and DDC do attempt to argue that counsel failed to conduct a reasonable inquiry into the matter at the outset, but the argument is based on the ultimate result, not on any evidence or argument regarding what investigation was undertaken by counsel before filing suit.

Nor do we believe Quelas's claims were frivolous at any stage of the proceedings. With regard to the question of whether Mexican or Michigan law applies, we cannot say that Quelas's position was so devoid of merit that it was frivolous. Ultimately, she was employed by a Michigan-based company, and she did reside in this state at certain points in time. This is not a situation where she had absolutely no contact with the state; it is just that under the facts of this case, her contacts are insufficient to warrant the application of Michigan law. While counsel may have had reason to doubt whether Michigan law would ultimately apply, we cannot say that counsel should be subject to sanctions for pursuing the matter.

With regard to Quelas's dual-employment theory, again, it is not as if the theory lacks all merit.[46] Quelas does, in fact, have employment relationships with both DDC and DDAM. It is just that under the facts of this case, those relationships are not distinct from one another. Given that this theory is not frivolous, and underlies Quelas's position with regard to the election-of-remedies doctrine and the application of res judicata, we cannot say that Quelas's position with regard to those doctrines was frivolous.

Daimler and DDC raised two additional theories in the trial court that it did not address: collateral attack and privilege. With regard to the former, Daimler and DDC contend that through this suit, Quelas has attempted to collaterally attack the November 3, 2011 order of the Board. A collateral attack occurs when a party attempts to use a second proceeding to attack a tribunal's decision in a prior proceeding.[47] Quelas does not seek to undo or alter the Board's decision through this suit, and thus, the proceeding is not a collateral attack. With regard to privilege, Daimler and DDC make a strained attempt to argue that Quelas may not rely on strategic decisions made by DDAM in the course of the Mexican proceedings, claiming that these decisions are protected by judicial privilege. This privilege applies in the context of a defamation claim, and protects statements made by judges, attorneys, and witnesses during the

---

[46] In response to Daimler's and DDC's arguments regarding res judicata and the election-of-remedies doctrine, Quelas argued that she had two separate and distinct employment relationships, one with DDC in Michigan, and one with DDAM in Mexico. She contended that her Michigan complaint arose from a separate employment relationship, and thus, was not duplicative of her Mexican suits. We agree with the trial court's assessment that Quelas had one employment relationship. We would clarify that under the circumstances, Quelas is correct that, under Michigan law, she had an employment relationship with DDC. But this employment relationship is not separate or distinct from her employment relationship with DDAM. See *Clark v United Tech Auto, Inc*, 459 Mich 681, 688-691; 594 NW2d 447 (1999) (explaining that, in the workers' compensation context, when a parent-subsidiary relationship exists, "an essentially vertical relationship exists between two business entities who, if warranted by the application of the economic realities test and the equities of the case, will be treated as essentially one entity for purposes of the exclusive remedy provision. . . . [I]n such circumstances, the separate existence of the two entities is disregarded").

[47] *Workers' Compensation Agency Dir v MacDonald's Indus Prod, Inc*, 305 Mich App 460, 474; 853 NW2d 467 (2014).

course of judicial proceedings.[48]  This case does not involve a defamation claim, nor could DDAM's strategic decisions be considered "statements" subject to the privilege.  These defenses clearly fail to demonstrate that the suit was frivolous.

Finally, Daimler and DDC argue that attorney fees are warranted because, at least according to them, Quelas committed perjury.  But what Daimler and DDC argue is that Quelas committed perjury *in the Mexican proceedings*.  Even assuming that she did so, the question is whether the Michigan action was frivolous, not whether the Mexican action was.  Daimler and DDC would essentially have this Court sanction Quelas for her conduct before an entirely different tribunal.[49]

As a final note, and while not the basis of our decision, we do find it somewhat dubious of Daimler and DDC to contend that the suit was frivolous.  Daimler and DDC sought fees for five attorneys who collectively worked over 8,000 hours on the case.  The fee request was for approximately $1.85 million.  It is difficult to understand how a case could be deemed frivolous when it took five attorneys that amount of time and effort to prevail on a summary disposition motion.  In any event, we find no clear error in the trial court's determination that the suit was not frivolous.  Accordingly, attorney fees were not warranted under MCL 600.2591.[50]

IV.  DOCKET NO. 330363

In Docket No. 330363, Quelas challenges the trial court's award of over $300,000 in taxable costs pursuant to MCR 2.625.  The challenged costs were incurred by Daimler and DDC in employing Stout, Risius, & Ross (SRR) to provide expert opinion testimony.  We find no basis to reverse this award of costs against Quelas.  "This Court reviews for an abuse of

---

[48] See *Oesterle v Wallace*, 272 Mich App 260, 264-265; 725 NW2d 470 (2006).

[49] Daimler and DDC also cite no Michigan law permitting the imposition of sanctions under MCL 600.2591 for acts of "perjury."  Rather, Daimler and DDC rely on two federal cases, *Blue v US Dep't of Army*, 914 F2d 525 (CA 4, 1990); and *Carrion v Yeshiva Univ*, 535 F2d 722 (CA 2, 1976).  Neither case applies MCL 600.2591.  Indeed, Daimler and DDC cite no precedent holding that committing perjury renders a case frivolous under MCL 600.2591.  This Court need not search for authority to support the argument.  *Magee v Magee*, 218 Mich App 158, 161; 553 NW2d 363 (1996).

[50] Quelas's brief seeks sanctions for filing a vexatious appeal pursuant to MCR 7.216(C).  Quelas must do so by motion, not by request in her appellate brief.  *Bonkowski v Allstate Ins Co*, 281 Mich App 154, 182; 761 NW2d 784 (2008).  See also MCR 7.216(C)(1) (providing that a motion for sanctions must be filed pursuant to MCR 7.211(C)(8)); MCR 7.211(C)(8) (requiring that a request for sanctions "be contained in a motion filed under this rule.  A request that is contained in any other pleading, including a brief filed under MCR 7.212, will not constitute a motion under this rule").

discretion a trial court's ruling on a motion for costs pursuant to MCR 2.625."[51]   Whether a particular expense may be taxed as a cost is a question of law, reviewed de novo on appeal.[52]

## A.  COMPLIANCE WITH MCR 2.625(F)

Quelas first argues that the request for taxable costs was procedurally barred due to a timeliness issue.  We find no merit to this contention.  The specific rule at issue, MCR 2.625(F), explains the following procedure for seeking taxable costs:

**(F) Procedure for Taxing Costs.**

(1) Costs may be taxed by the court on signing the judgment, or may be taxed by the clerk as provided in this subrule.

(2) When costs are to be taxed by the clerk, the party entitled to costs must present to the clerk, within 28 days after the judgment is signed, or within 28 days after entry of an order denying a motion for new trial, a motion to set aside the judgment, a motion for rehearing or reconsideration, or a motion for other postjudgment relief except a motion under MCR 2.612(C),

> (a) a bill of costs conforming to subrule (G),

> (b) a copy of the bill of costs for each other party, and

> (c) a list of the names and addresses of the attorneys for each party or of parties not represented by attorneys.

In addition, the party presenting the bill of costs shall immediately serve a copy of the bill and any accompanying affidavits on the other parties.  Failure to present a bill of costs within the time prescribed constitutes a waiver of the right to costs.

(3) Within 14 days after service of the bill of costs, another party may file objections to it, accompanied by affidavits if appropriate.  After the time for filing objections, the clerk must promptly examine the bill and any objections or affidavits submitted and allow only those items that appear to be correct, striking all charges for services that in the clerk's judgment were not necessary.  The clerk shall notify the parties in the manner provided in MCR 2.107.

(4) The action of the clerk is reviewable by the court on motion of any affected party filed within 7 days from the date that notice of the taxing of costs was sent,

---

[51] *Van Elslander v Thomas Sebold & Assoc, Inc*, 297 Mich App 204, 211; 823 NW2d 843 (2012).

[52] *Id*.

-19-

but on review only those affidavits or objections that were presented to the clerk may be considered by the court.

After Daimler and DDC filed their bill of costs, Quelas filed a timely objection. The court clerk responded with a letter stating the following:

The Defendant's attorney submitted a Bill of Costs that was filed with the Wayne County Clerk's Office on December 22, 2014.

Be advised that Plaintiff['s] attorney filed objections to the submitted Bill of Costs. Therefore, you will have to request a hearing on a motion before Judge Lita Masini Popke for the submitted Bill of Costs.

The letter is dated January 26, 2015, and bears a filing stamp dated January 28, 2015. Daimler and DDC filed a motion seeking costs on February 6, 2015, nine days after the filing stamp, or eleven days after the date of the letter. In either event, it cannot be disputed that the motion was filed more than seven days after the date of the letter. For that reason, Quelas argues that the motion was untimely, and that Daimler and DDC forfeited any right to seek taxable costs. We disagree.

The procedure contemplated by the court rule is one where, after receiving objections, the court clerk analyzes the bill and supporting evidence to determine what charges are proper.[53] After this process, the court clerk issues a notice of the taxing of costs. Any affected party then has seven days to seek judicial review of the clerk's actions.[54] But in this case, and as is apparently standard practice by the Wayne County Clerk, the clerk did not follow the procedure outlined in MCR 2.625(F). The clerk did not analyze the bill of costs, objections, and supporting evidence or issue a notice that any costs would be taxed. Rather, the clerk simply informed Daimler and DDC that a hearing would be necessary. There simply was no "action of the clerk" or "notice of the taxing of costs" issued by the clerk which would have triggered the seven-day period to seek judicial review.[55] Accordingly, Daimler and DDC did not fail to file their motion seeking costs in a timely manner.

## B. ABILITY TO TAX EXPERT WITNESS EXPENSES

Quelas challenges whether the expenses taxed as costs related to SRR were taxable. Under Michigan's court rules, "[c]osts will be allowed to the prevailing party in an action, unless prohibited by statute or by these rules or unless the court directs otherwise, for reasons stated in

---

[53] MCR 2.625(F)(3) ("[T]he clerk must promptly examine the bill and any objections or affidavits submitted and allow only those items that appear to be correct, striking all charges for services that in the clerk's judgment were not necessary.").

[54] MCR 2.625(F)(4) ("The action of the clerk is reviewable by the court on motion of any affected party filed within 7 days from the date that notice of the taxing of costs was sent . . . .").

[55] MCR 2.625(F)(4).

writing and filed in the action."[56]  But "[t]he power to tax costs is purely statutory, and the prevailing party cannot recover such expenses absent statutory authority."[57]  Thus, the presumption in civil cases is that costs will be allowed as a matter of course.[58]  But not all expenses may be taxed.[59]  This is because the term "costs" must be understood through statutory provisions that define what items are taxable as costs.[60]

By statute, expert witness fees may be taxed as costs; lay witness fees, on the other hand, may not.[61]  Thus, expenses for witnesses providing opinion testimony may be taxable, while expenses for those witnesses providing fact testimony is not taxable.[62]  Further, all of an expert witness's fees are not taxable.[63]  "Conferences with counsel for purposes such as educating counsel about expert appraisals, strategy sessions, and critical assessment of the opposing party's position are not regarded as properly compensable as expert witness fees."[64]  Rather, taxable costs include compensation for court time, the time required to prepare expert opinion testimony, and the traveling expenses of the witness.[65]

Quelas argues that SRR's outline, the ultimate result of its work, is fact testimony, not expert testimony.  We disagree.  SRR was hired to refute the opinions of Quelas's own expert witness, who opined that Daimler's investigation into Quelas's conduct was biased and not independent.  SRR was retained to examine the investigation report and the evidence supporting the investigation, from which it formed an opinion regarding whether Daimler's investigation was proper.  Thus, the result of SRR's work was an opinion, which, just like the opinion of Quelas's retained expert, would have been presented to the jury had the matter proceeded to trial.  Clearly, this opinion was based on the underlying factual record that SRR examined.  And of

---

[56] MCR 2.625(A)(1).  See also *Van Elslander*, 297 Mich App at 216.

[57] *Van Elslander*, 297 Mich App at 216 (citation omitted).

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.* at 217.  Specifically, the statutory authority for taxing expert witness fees is derived from MCL 600.2164(1), which provides, in relevant part:

> No expert witness shall be paid, or receive as compensation in any given case for his services as such, a sum in excess of the ordinary witness fees provided by law, unless the court before whom such witness is to appear, or has appeared, awards a larger sum, which sum may be taxed as a part of the taxable costs in the case.

[62] *Van Elslander*, 297 Mich App at 217.

[63] *Id.* at 218.

[64] *Id.* (quotation marks, brackets, and citation omitted).

[65] *Id.*

course, SRR cited these facts when explaining how it arrived at its ultimate conclusion. That SRR explained the factual basis for its opinion is not in any way unusual. Rather, all expert opinion testimony must be "based on sufficient facts or data[.]"[66]

Quelas contends that SRR's work largely amounted to mere data assembly, which is not a taxable cost.[67] While Quelas is not specific, it appears that she believes the many hours SRR spent reviewing documents was merely "data assembly." It was not. This was the investigation into the evidence that allowed SRR to form its opinions. Taxable costs include compensation for "the time required to prepare [an expert] for their testimony."[68] Clearly, this matter involved an analysis of a massive amount of documents and other evidence. SRR could not opine regarding the validity of the investigation without reviewing and analyzing this evidence. SRR's investigation into the evidentiary record was required to prepare its ultimate opinion, and thus, is a taxable cost.[69]

Relying on *Hartland v Kucykowicz*,[70] Quelas contends that it is reversible error for the trial court to fail to specifically demarcate between taxable and nontaxable costs. In *Hartland*, this Court explained that time spent by experts educating counsel, strategy sessions, and critical assessment of the opposing party's position is not a taxable cost.[71] This Court then explained:

> In the instant case, defendant's expert witness submitted an itemized bill for services rendered. The total fee was $10,450. In ruling on defendant's motion for expert witness fees, the trial court found that $10,000 was excessive. The trial court did not specify which of the services rendered and listed on the invoice were compensable and which were not compensable. Nor did the trial court explain how it determined that $7,500 was a reasonable fee. Accordingly, we reverse the award of $7,500 in expert witness fees and remand for a hearing to determine the amount of reasonable expert witness fees in a manner consistent with *Lufran*.[72]

Properly understood, *Hartland* simply stands for the proposition that certain fees of an expert witness are taxable, while others are not. And under the facts of *Hartland*, a remand was

---

[66] MRE 702.

[67] See *Van Elslander*, 297 Mich App at 221 ("It is . . . unclear whether costs were taxable for work attributable to assistants, because Malzahn's bill does not specify whether the time was spent preparing him to express an opinion or merely for assembling data.").

[68] *Id.* at 218 (citation omitted). What might be considered "data assembly" would be the time it took to collect the documents and other evidence that SRR reviewed. But SRR did not perform these tasks; rather, SRR was given the records, which it then investigated.

[69] *Id.*

[70] *Hartland v Kucykowicz*, 189 Mich App 591; 474 NW2d 306 (1991).

[71] *Id.* at 599, quoting *Detroit v Lufran Co*, 159 Mich App 62, 67; 406 NW2d 235 (1987).

[72] *Id.*

required to explore the issue. Here, an evidentiary hearing was held. At the hearing, Raymond Roth III explained how he separated those fees that were related to developing SRR's opinions from those that merely amounted to noncompensable consultation time. Given that the trial court awarded Daimler and DDC the amount Roth identified as related to the development of SRR's opinion, clearly, the trial court found his testimony on the subject adequate. Quelas fails to dispute the accuracy of Roth's testimony on the subject. Thus, Quelas's citation to *Hartland* fails to demonstrate error.[73]

## C. MRE 702 AND *DAUBERT*

Quelas also contends that Daimler and DDC's proffered expert testimony would not have been admissible under MRE 702, and thus, is not expert testimony that can be taxed. MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The rule incorporates "the standards of reliability that the United States Supreme Court articulated in *Daubert v Merrell Dow Pharm, Inc*, in order to interpret the equivalent federal rule of evidence."[74] MRE 702 "requires the trial court to ensure that each aspect of an expert witness's proffered testimony—including the data underlying the expert's theories and the methodology by which the expert draws conclusions from that data—is reliable."[75] Thus, the trial court acts as a gatekeeper, ensuring that proffered expert opinion testimony is both relevant and reliable.[76] However, it is important to remember that the trial court's focus "must be solely on principles and methodology, not on the conclusions that they generate."[77] In addition, if "non-scientific expert testimony is involved," "the relevant reliability concerns may focus upon

---

[73] Quelas also cites *D'Itri v Hobbs*, unpublished opinion per curiam of the Court of Appeals, issued January 27, 2015 (Docket Nos. 315869 and 319038). As *D'Itri* is unpublished, it is of no precedential value. MCR 7.215(C)(1).

[74] *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016), citing *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[75] *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 779; 685 NW2d 391 (2004).

[76] *Elher*, 499 Mich at 22-23.

[77] *Daubert*, 509 US at 595.

-23-

personal knowledge or experience."[78]  The trial court's inquiry "is context-specific and must be tied to the factors of a particular case."[79]

Quelas first contends that the trial court failed to ensure that SRR's opinion testimony would have been reliable had it been presented to a jury, thus abdicating its gatekeeping function.  Quelas argues that she was prohibited from inquiring into "the substance of the SRR work for purposes of challenging admissibility."  Quelas's appellate brief cites a number of instances where counsel was not permitted to inquire into various areas.  None of these areas, however, was the reliability of SRR's methodologies.

Quelas first discusses what occurred at the outset of the evidentiary hearing.  Quelas's counsel asked that the trial court begin the hearing by addressing the "qualifications of the experts."  The trial court agreed that this was a relevant consideration, but indicated that it would decide the matter during the hearing rather than as a preliminary matter.  The trial court went on to explain that it was not "terribly concerned" with whether the witnesses were qualified as experts, but rather, "whether or not the work that they performed actually falls within the scope of [MRE] 702 . . . ."  Quelas's counsel stated that the "issue is are they qualified to opine on an expatriate relation[ship]," after which the trial court asked counsel to "sit down, we're . . . taking the testimony."  The trial court explained that counsel could "make the arguments," but that it would need "to hear the testimony" to have a proper context.  This exchange does not demonstrate that the trial court failed to perform its gatekeeping function.  The court simply stated that it would consider whether the experts were qualified on the basis of the testimony to be adduced at the hearing, not as a preliminary matter.  In any event, the exchange had nothing to do with the reliability of the experts' methodology.

During the second day of the hearing, counsel for Daimler and DDC discussed with the trial court the prospect of admitting the eight binders of documents that supported SRR's outline of its opinion.  The trial court clarified that the purpose of the binders was to show the amount of work that was done.  The court then explained that it was "obviously not going to be trying the legitimacy of anyone's opinions, we're just trying to determine whether the work that was done justifies the fees that are being requested, among other things."  On appeal, Quelas states her disagreement with this pronouncement and the trial court's general refusal to allow her to inquire into the veracity of SRR's opinions, as well as the trial court's repeated statements that it was not concerned with SRR's ultimate conclusion.  The trial court's understanding of the scope of its inquiry was exactly correct.  As explained, the trial court's inquiry "must be solely on principles and methodology, not on the conclusions that they generate."[80]

Quelas lists several questions that she believes would have shown that SRR used little or no scientific methodology.  Many of these proffered questions do not, in actuality, relate to the

---

[78] *Lenawee Co v Wagley*, 301 Mich App 134, 163; 836 NW2d 193 (2013).

[79] *Id*. (quotation marks and citation omitted).

[80] *Daubert*, 509 US at 595.

reliability of SRR's methodology in regard to reaching its ultimate conclusion.[81] Further, given that SRR was offering non-scientific expert opinion testimony, the experience and personal knowledge of SRR would suffice to satisfy the relevant reliability concerns.[82] Quelas does not argue that the expert who ultimately provided SRR's opinion, Michael Kahaian, lacked personal knowledge and experience sufficient to permit him to render a reliable opinion. In any event, Kahaian explained the methodology he used. Kahaian explained that he used a methodology that looks at the authorization of transactions to determine if internal controls were followed at DDAM. Kahaian testified that these methodologies were generally accepted in the field, and were reliable. The trial court likewise found that Kahaian's methodology was reliable. The trial court did not fail to perform its gatekeeping function.

Quelas also contends that SRR's opinion was not relevant. Quelas correctly notes that expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue[.]"[83] "In other words, the expert opinion testimony must serve to give the trier of fact a better understanding of the evidence or assist in determining a fact in issue."[84] Quelas contends that Kahaian offered nothing more than what a jury could determine itself. According to Quelas, a jury could be expected to compare Daimler's investigation report to the documentary evidence reviewed by SRR, which totaled somewhere in the vicinity of 100,000 documents, and make its own determination regarding whether the result of the investigation was supported. Quelas's position is dubious given that she hired her own expert to perform the same tasks that SRR performed.

Ultimately, Quelas's argument fails to appreciate that SRR's job was not simply to compare documents to the report, but rather, to provide an opinion regarding whether the investigation was performed in a proper manner. SRR was hired to counter the expert opinion of Quelas's expert, who she hired in an effort to demonstrate that the investigation was done in an improper and biased manner. SRR examined the evidence to determine whether Daimler's investigation was, in fact, biased or otherwise improperly conducted. SRR conducted its investigation by examining the report and documentary evidence to determine whether Daimler reached appropriate conclusions. Ultimately, SRR, in contrast to Quelas's expert, reached the opinion that the investigation was performed in a proper manner and reached an appropriate conclusion. An average juror cannot be expected to understand the complex financial dealings

---

[81] As examples, Quelas contends she could have asked whether document cataloguing and categorizing required specialized knowledge; "[w]hat elements of reviewing" Daimler's report "and categorizing documents based on the allegations in such a report constituted something that a fact finder could not understand based on review of the evidence[;]" whether Kahaian's "regurgitation of facts" required specialized knowledge or expertise; and whether SRR's review of documents "was something that a trier of fact could not discern on his or her own."

[82] *Lenawee Co*, 301 Mich App at 163.

[83] MRE 702. See also *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 79; 684 NW2d 296 (2004).

[84] *Craig*, 471 Mich at 79 (quotation marks and citation omitted).

that were at the heart of the investigation, nor the manner in which such an internal investigation would be conducted. SRR's opinions would have given a juror a "better understanding of the evidence or assist in determining a fact in issue,"[85] and thus, was relevant.

Quelas also asserts that Kahaian failed to identify or describe a methodology used to formulate his opinions. This is simply false. As explained, Kahaian testified regarding the methodology used to perform the investigation, including the accepted industry standards he utilized. And in a final argument, Quelas notes that Kahaian's opinions in an entirely unrelated matter were stricken in federal court in 2008.[86] Be that as it may, that Kahaian was not permitted to testify as an expert witness in an entirely different case, and before an entirely different court, has absolutely no relevance to the present matter. And in any event, the basis for striking Kahaian's opinion was that it was based on a flawed factual foundation.[87] The federal district court agreed that Kahaian was qualified to offer an expert opinion and that the methodology he utilized in that case was reliable.[88]

Daimler and DDC do note that the trial court committed a computational error in its award. Daimler initially sought $307,808 in fees for expert services, but later found that $4,330.50 had been erroneously included in this request. Thus, Daimler and DDC reduced their request, with regard to expert witness fees, to $303,477.50. The trial court, however, awarded $307,808 in expert witness fees. To correct this error, we direct the trial court to correct its order to reduce the amount of taxable costs by $4,330.50. In all other respects, the award is affirmed.

V. DOCKET NO. 328766

In Docket No. 328766, Daimler and DDC challenge the trial court's refusal to sanction Quelas pursuant to MCR 2.114 with regard to a motion she filed to stay proceedings in the trial court. We vacate the trial court's decision with respect to the request for sanctions and remand for further proceedings.

A trial court's ruling on a motion for costs and attorney fees is reviewed for an abuse of discretion.[89] "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes."[90] To the extent the trial court's decision involves factual findings, those findings are reviewed for clear error.[91] "Clear error signifies a decision that strikes [the reviewing court] as more than just maybe or probably wrong."[92] A factual

---

[85] *Id.* (quotation marks and citation omitted).

[86] See *Rondigo, LLC v Casco Twp*, 537 F Supp 2d 891 (ED Mich, 2008).

[87] *Id.* at 895-896.

[88] *Id.* at 894-895.

[89] *Keinz v Keinz*, 290 Mich App 137, 141; 799 NW2d 576 (2010).

[90] *Id.*

[91] *Id.*

-26-

finding is clearly erroneous if, despite the existence of evidence supporting the finding, the reviewing court, after reviewing the entire record, is left with a definite and firm conviction that a mistake has been made.[93]

The motion at issue was filed by Quelas after the Mexican appellate court vacated the Board's $2.2 million judgment against DDAM. Quelas argued that the basis for the decision was that DDC, not DDAM, was Quelas's employer, and thus, DDAM could not be responsible for any back wages. She attached to the motion a Spanish-language version of the decision, and no other evidence supporting her representation regarding the basis of the ruling.[94] Daimler and DDC first moved to strike the motion, in part because it was not supported by an English-language translation of the decision, or by any other evidence supporting Quelas's representation regarding the basis of the decision.

Daimler and DDC also filed a response to the motion and a cross-motion seeking sanctions pursuant to MCR 2.114. Specifically, Daimler and DDC argued that counsel failed to adequately investigate the basis of the Board's decision before filing the motion.[95] Daimler sought "attorney fees and costs, including translation and expert fees," incurred to defend the motion. On July 22, 2015, the trial court issued an opinion and order striking the motion. In the same order, the trial court denied the request for sanctions. However, the only reason given by the trial court was that it "determined the matter on briefs without oral argument." For reasons that are not entirely clear, on October 7, 2015, the trial court issued a second order that denied the request for sanctions a second time. Daimler and DDC now contend that the trial court's denial of the request for sanctions was an abuse of discretion.

Before addressing the argument raised by Daimler and DDC, we briefly address a jurisdictional challenge raised by Quelas. Quelas contends that the request for sanctions was denied by the October 7, 2015 order, and that Daimler and DDC have appealed the wrong order. Quelas is incorrect. Daimler and DDC correctly appealed the July 22, 2015 opinion and order, which clearly and unequivocally denied the request for sanctions.

We agree that the trial court abused its discretion when it disposed of the request for sanctions. The request was premised on an argument that Quelas failed to adequately investigate the Board's decision. The trial court's explanation that it decided the matter on briefs fails to address the reason for the request. This decision is well outside of any reasonable and principled

---

[92] *In re Williams*, 286 Mich App at 271.

[93] *Id*.

[94] As we discussed earlier, this representation is erroneous. The Board vacated the award not because DDC was deemed to be Quelas's employer, but because Quelas failed to establish that she was unjustly terminated by DDAM.

[95] See MCR 2.114(D) (by signing a document, an attorney certifies that "to the best of his or her knowledge, information, and belief *formed after reasonable inquiry*, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law[.]" (emphasis supplied); MCR 2.114(E) (providing for the imposition of sanctions if an attorney violates MCR 2.114(D)).

outcome, and thus, is an abuse of discretion. Accordingly, we vacate the trial court's resolution of the request for sanctions and remand for reconsideration of the request.

However, we wish to clarify the scope of the remand proceedings. On appeal, Daimler and DDC raise a variety of arguments that go beyond the question of whether Quelas's counsel performed an adequate investigation before filing the motion. These arguments were not presented to the trial court as reasons why sanctions would be appropriate. We do not believe Daimler and DDC should be permitted to expand the scope of their request through this appeal. Accordingly, the only question to be answered by the trial court on remand is whether Quelas's counsel performed an adequate investigation before filing the motion to stay proceedings. If the answer to this question is yes, no sanctions shall issue; if the answer is no, the trial court "shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages."[96]

## VI. CONCLUSION

In Docket No. 326290, we affirm the trial court's summary disposition ruling. In Docket No. 326345, we affirm the trial court's order denying the motion for attorney fees. In Docket No. 330363, we affirm the trial court's award of taxable costs, but remand for correction of the amount of costs. The award shall be reduced by $4,330.50. In Docket No. 328766, we vacate the trial court's denial of sanctions and remand for further proceedings consistent with this opinion.

We do not retain jurisdiction. No costs, neither party having prevailed in full.[97]

/s/ Michael J. Talbot
/s/ Christopher M. Murray
/s/ Mark T. Boonstra

---

[96] MCR 2.114(E).

[97] MCR 7.219.

-28-